## Carter, Appellant, *v.* Spencer.

A patent is the highest evidence of title, and furnishes the presumption that all the prerequisites required by law have been complied with previous to its emanation. The validity of a patent cannot be questioned, either in a court of law or equity except on the ground of fraud or mistake.

Where a tract of land to which there was a pre-emption claim was entered at the Land-Office, and the Register did not require an oath under the instructions of the Treasury Department, that the land was not subject to a pre-emption, and it did not appear that the person entering the same had committed any act of fraud in procuring the entry which was subsequently patented, it was determined that such purchase was a valid conveyance of the land.

Where the settlement is made on the corners of sections, the pre-emption should be confined to the section which contains the most of the settlement.

APPEAL from the superior court of chancery.

Armstead Carter filed his bill in the superior court of chancery against William Spencer, in which Carter, in substance, charged that he was, at the passage of the act of Congress of the 5th of April, 1832, in the sole and exclusive occupation of the west half of the south-west quarter of section twelve, township six, range one, west, and was the only person entitled to pre-emption under said act; that on the 28th day of September, 1832, he applied to the office and made his application in writing, paid his money and furnished the proof required by the act and the instructions of the Secretary of the Treasury, but that his entry was not received: the same land having, in the month of June previous, been entered by the defendant Spencer. But the Register and Receiver promised to send on the papers, the evidence of his claim, to the Commissioner of the general land-office. The papers, however, were not remitted, being for a long time mislaid, but were at length found: that complainant's house was partly on the said eighth, and partly on land owned by him, and his improvement was also in part on the same or on land adjoining owned by him. That the defendant Spencer had perfected his right by a patent from the government, and had instituted an

Carter, Appellant, *v.* Spencer.

action of ejectment.  The bill prayed that the patent be vacated, and the title vested in the complainant, and for general relief, &c.

To the bill the defendant Spencer answered, and by his answer admitted that he made the entry charged in the bill, not by virtue of any right to pre-emption, but by virtue of the general right which he was advised he had to enter the land of the government at the minimum price.  He made no affidavit that no person was entitled to pre-emption, because it was not required of him, and such was not the practice under the act of 1832.  He knew that the complainant had a house situated, as alleged, on the land, but one-third of said house was not on the eighth in dispute, but about one-fifth.  He did not believe that complainant was entitled to pre-emption, the law being that the settler upon the public lands is entitled to enter one-half quarter section, to include his improvements.

The Chancellor dismissed the bill, with costs.  An appeal was taken, and the question in this court is, whether the court below erred?

Hutchinson, for appellant.

The answer admits, in substance, all the allegations of the bill, and is indeed, in effect, a demurrer to the relief prayed, or an argument against it.  The matter not admitted is fully proved.

The objections interposed by the answer, or urged on the hearing before the Chancellor, if recollected correctly, may be stated to be :—

1. That the application of Carter was not *literally* correct.

2. That as his house and improvement were not wholly on the tract in question, he had no pre-emption right.

3. That by building his house on the corner of a section, he lost all pre-emption right.

4. That Spencer, by becoming a prior enterer, acquired a vested right, and his entry was lawful.

5. That the omission or neglect of the Register, &c. were the omission and neglect of Carter ; and neither law nor equity helps or pities one that sleeps on his rights.

1. Was Carter's application conformable to the act and the instructions under it ?  By the act, it was essential that he should

Carter, Appellant, *v.* Spencer.

have been, within the period of six months next after its passage, a settler *and* housekeeper on the eighth, and that the eighth should have included his improvement. By the instructions those facts were to have been manifested by the affidavit of the pre-emptor, sustained by that of at least one disinterested person. Exhibit A contains the affidavits. That of Carter is, in sub-stance, that at the date of the act about one-third of his dwelling house was situated on the land; that he, ever since, continued to reside in the house, and did then, (Sept. 28, 1832,) and that the other portions of the house were on lands solely owned by him. This is repeated or confirmed by Pitman's affidavit. Was he then a settler and housekeeper? If by having a dwelling house and residing in it made him a keeper of the house, he was a housekeeper; and if that house was on the public domain, he was a settler on that domain. It could only be contemptible to make farther remark on this objection. The answer admits that the affidavits were made, and raises no objection to them other than that they did not show that the whole improvement was on the land.

2. Neither the act nor instructions required that the whole of an improvement should be on the land claimed. Carter owned already the other three-eighths on which his dwelling and im-provement were situated. That on the south had been entered by Bell, of whom Carter purchased, in 1831; that south-west had been entered by Carter, in 1831; and that west was entered by him on the 4th of June, 1832, seven days prior to Spencer's en-try. It was then true, as asserted in the affidavits, that Carter was the proprietor of the three-eighths, or "rest of the land," on which his dwelling and improvements were situated. One-third, as he says, or about one-fifth, as Spencer has it, of the dwelling of Carter, and four acres of his plantation, were on the land in question. To the land owned already by Carter no one had a right of entry or purchase at public or private sale under the government. The eighth in question was either subject to pre-emption, or private entry, or public sale. Was Carter a settler and housekeeper on it? If so he had pre-emption. If the other three-eighths, or either of them, had been vacant, that is, unap-propriated, then it might have been an inquiry of election in

regard to the pre-emption; but there was only the one-eighth unappropriated; Carter had exerted no pre-emption right; he was a settler and housekeeper on that eighth; and if he preferred his claim within the time limited, and paid the consideration, his right became paramount to that of any intermediate private enterer.

3. It is supposed that because Carter's dwelling and plantation were on the intersection corner of four sections he was precluded from pre-emption. The act was passed on April 5th, 1832. The south and south-west eighth, as shown, were entered and acquired by Carter as a common enterer of one and a purchaser of the other, and in regard to these neither Spencer, nor any other person, nor the government, could complain. The law then governing on the subject had been satisfied. The west eighth was entered by Carter on the 4th of June, 1832, and as to it there could be no complaint. The eighth in question, on the 11th of June, remained to be appropriated. By accident, as must be presumed, Carter, in building his dwelling and opening his plantation, had extended part of them upon that eighth. A survey had been made between the parties to ascertain the lines dividing their lands, that is, lands already owned by Carter and lands of Spencer that adjoined them, and in that survey, which Spencer admits he attended, he had become perfectly acquainted with the extent of the improvements on the contested tract. Why was it then that Carter should not have pre-emption to that tract? Had Spencer or any other applied to enter either or any of the other three-eighths and been prevented in consequence of the improvements on them? Nothing of that sort is pretended. If such application had been made whilst the improvement was still on two or more unentered eighths, the pre-emptor would have been compelled to make an election of one to be regarded as subject to pre-emption. But Carter, as to two, and Bell, under whom he claimed, as to a third, had become the purchasers by entry. Had he not the right to do so in regard to the eighth lying west, on the 4th of June, 1832? Neither Spencer, nor any third person to be injured, had any improvement or ground of pre-emption; and he could safely take the oath that there was no interfering improvement. He rightfully appropriated it as a private enterer.

Carter, Appellant, *v.* Spencer.

Spencer might have entered one of the two still belonging to the public; for by entering one he would still have left another to have satisfied Carter's pre-emption; but he did not do so. Carter's money was as good as another's, and by paying it he got the west eighth. There was on the 11th of June, 1832, the tract in question to be appropriated. Carter had made no pre-emptive claim; the act allowed him one-eighth if he had made an improvement on it and occupied as the act prescribed; his improvement and occupancy were *upon* this tract; therefore he had the right of pre-emption. He made application, paid his money, and did every thing in his power to have his right perfected.

4. Did, however, Spencer, by his prior entry, overturn that right? The answer admits that the affidavit required by the 5th instruction from the general land-office, predicated on the act of Congress, was not made. That required that the private enterer, not being a pre-emptor, should in all cases, during the six months preceding October 5th, 1832, make affidavit that the tract sought to be entered was not, to the best of his knowledge and belief, subject to any claim by pre-emption right under the act; and this rule is prescribed expressly to prevent what has here occurred, collision. No other act of Congress, nor any other instruction of the land-office had any bearing on the matter. The act itself gave to the Secretary of the Treasury the power to prescribe the rules by which the pre-emption claims should be protected, exhibited and perfected; and to prevent collision between the private enterer and the pre-emption claims that were intended to be secured by the act, he, through the Commissioner of the land-office, required the preliminary affidavit in *every* case of private entry during those six months. The authority to impose that condition on private entries will not be doubted; but we are led to inquire what was the nature and scope of the requisition? Was it a mere direction to the subordinate, the Register, which he might observe or omit at his pleasure? The great object of the act was to secure to the settler the house he had built and the field he had opened on the domain acquired from the savage; and to that end the process of private entry was rendered subordinate. It was deemed important to anticipate and prevent all collision with the free, full, and perfect exertion of the chief and favored right of

pre-emption. The requisition pre-supposed that few, if any, would enter a public office and leave there a lasting memorial of a perjury, in order to obtain entry of an eighth of land; and that where there was no occupancy in the way the oath could be freely and perfectly taken. There was nothing onerous in it; but the observance of it would generally prevent conflict and collision.—— It was important to the occupant to be thus protected. Will it be said in this case that it is the same to Carter as if the oath had been made? Here we come to this point. If the Register had exacted the oath it would not have been made, and Carter would have had the patent without this collision and expense to obtain his right. If however the affidavit had been made, it is true the entry under it would not have prevailed, because it would then have superadded perjury to fraud: but this very consideration demonstrates the conclusion that the requisition was a matter of substance, and that any private entry during the period without that essential preliminary was invalid. The right of private entry was to be exerted, only on that condition precedent. We may suppose indeed that if an entry had been made, without it, where there was no adverse occupancy, the enterer might not have been disturbed; but this is no proof that an unquestionable right was imparted. Let us suppose, in that case, the government had refused a patent, but granted the land to another, could the enterer, who disregarded the requisition, prevail against a junior enterer and patentee? Certainly not: he could get back his money—and that alone. But who constituted Spencer or the Register the judge whether Carter had or had not pre-emptive right, and that as to the tract in question Spencer was not to make the required affidavit. The requisition was without limit. The Register was a ministerial officer of the general government with the act and instructions before him. To them he was bound to conform. Any departure from them was at least not lawful. But Spencer explained to him the situation of Carter's house and improvements, and still he not only required no affidavit, but, as Spencer says, advised him that an affidavit was not needed! The Register then placed himself above the act of Congress and instructions from the secretary of the treasury, and in Carter's absence, mounting the judgment seat gave to Spencer a corner of Carter's dwel-

ling and a fourth of his plantation! Such is the judgment the chancellor has confirmed! The bill, it will be seen, does not criminate the Register. It proceeds on the idea that he might have acted on the misinterpretation of the act. and instructions, and in ignorance of the fact of interfering occupant rights; and such the counsel for Carter believes was the fact—and it is a belief and confidence due to the memory of a faithful, honest and efficient officer—but the answer criminates him as a participator in the mean and fraudulent act of knowingly entering a man's dwelling and field that the bounteous and wise policy of the government had secured to him. The very idea of the act must excite a just indignation and abhorrence; and there is no room for weighing words—of hanging principles upon letters and of sacrificing substance for form in order to patch up the iniquity.

5. Any objection as to negligence or laches on Carter's part is answered by the evidence. Within the time limited by the act he made his application, filed his proofs, paid into the land office the government price; and as there had been a prior, (tho' illegal and void certificate granted,) the Register promised to have the conflicting claims properly transmitted for adjudication. Carter applied repeatedly, but the papers were lost or mislaid, and the promise was renewed. Thus it stood until Spencer had the temerity to bring his ejectment. The progress of that suit was arrested by the injunction in this case, and the Register died. The papers have been found since the ejectment.

Hughes for appellee.

We insist that the court pronounced the only decree which could be pronounced in the cause. This we will proceed to show in a few words.

1. There was no affidavit by Carter, as required by the regulations made by the secretary of the treasury, in pursuance to the law.

The law is, that any settler, being a house-keeper, upon public lands, shall have a right to enter, &c. under such regulations of the secretary of the treasury, as have been or may be prescribed. See public land laws, instructions and opinions, vol. ii. p. 561–2.

The secretary of the treasury, by virtue of this act, on the 8th

[Carter, Appellant, *v.* Spencer.]

May, 1832, addressed a circular to the registers and receivers of the United States land offices, and thereby prescribed the regulations, by virtue of which, entries under the act were to be made. The proof by these instructions of the existence of the facts to entitle a party to pre-emption, was an affidavit of the party, that he is a settler and house-keeper on public lands, and that the land applied for, includes his or her improvement. The form of the affidavit is given, which is in substance as just stated, and was to be sustained by the affidavits of one or more disinterested persons. The affidavit is to be taken before a magistrate, or other person duly authorized by law, to administer oaths. Ib. 562–3.

It is true that the affidavit set out with the bill purports to be sworn to before "Lewis Bond, J. P." but it is no where stated in the body of the affidavit, or elsewhere, what these letters stand for, whether for Justice of the Peace, or what else they are intended to indicate. It is well settled, that where an act is required to be done before an officer of a particular description, and a person assumes upon himself to do the act, that he must state his character, so that he whose duty it is to pass upon the validity of the act done, may see that the law is complied with. See Patton's lessee *v.* Brown, 1 Cooke T. R. 134.

The regulation of the secretary of the treasury was, that the proof should be taken before a magistrate, or some other person authorised to administer an oath. The same is taken before a person who does not state whether he is a magistrate or not, but merely adds to his name "J. P." The right under the act of congress to enter, &c. did not and could not vest, unless the party claiming the right showed by affidavit taken according to the act, that he was entitled. This proof was not made and the right did not vest.

If the person before whom the oath was taken, had stated that he was a magistrate, or had stated that he was an officer of any other description, and that description of officer had been authorised to administer an oath, then the proof would have been good. But, until the proof was in accordance with the requirements of the act of congress, and the instructions of the secretary of the treasury, the officer to whom the application was made, had no power and could not give the right.

VOL. IV.—5

2. It will be seen by an inspection of the act of congress, of the 5th April, 1832, and the regulations of the secretary of the treasury, made in pursuance thereof, that the right to pre-emption vested by the statute or act, is to settlers and house-holders. The regulations require the affidavit of the party claiming the right to be, that he is an actual settler and a house-keeper on the land proposed to be entered, not a settler or house-keeper in the alternative, but he must be both a settler and house-keeper. We take it, that this requirement of the act of congress and the regulations under it must be complied with in form and substance, or the party cannot claim the right, although it may be true that he has subsequently proved that he was in fact within the rule, by being both a settler and house-keeper. See Orillion and Lacroix *v.* Deslondy, 1 Louisiana Rep. 53.

The application to enter under the act has to be made within six months (see the act before referred to) and the application has to be made in conformity to the act and regulations, and, unless so made within six months from the passage of the act, no right vests.

Now apply these rules and principles to the case of the complainant below. Instead of complying with the requirements before alluded to, he swears in his affidavit, that he resided on the land at the passage of the act, has resided there ever since, and still resides there. What is this but a swearing that he was a *settler* on the land? He does not pretend in his affidavit that he was a house-holder. And will the court presume that he was a house-keeper, (where the fact, in order to be admitted, is required to be sworn to,) unless it be directly sworn to? Again—the statute makes a direct requirement that two facts should exist, in order that a party may shew that he is entitled to the bounty proposed by the act making the requirement. He comes and claims to be within the rule; yet on the face of his application, it appears most manifestly that he is not within the rule. It is then clear that he cannot claim the bounty. Again—the intention of the legislature must be looked to, and that intention must be gathered from the law itself. What is the intention manifested by the words of the act under consideration? Clearly to bestow a bounty upon a certain class of individuals—*settlers, heads of families,*

*house-keepers,* on the vacant and unappropriated lands of the government. If this was not the intention of the act, why were both the terms, *settler* and *house-holder* used? If the intention were to bestow the bounty upon such persons only as were in the occupation of the vacant land of the government, the term house-keeper will be stricken from the act as senseless. But Congress in using the terms used intended what they said for an obvious reason. It is true that a party may reside upon land and yet not be a house-keeper. The land may be in the actual occupation of one man, when that possession is the possession of another, and both at the time may reside on the land, yet the person whose possession it is in fact, may not be a house-keeper. For instance, suppose before the passage of the act of 1832, Carter went upon the land in controversy, made his improvement, built his house, and there resided until just before the passage of the law, he leaves his improvement to another person, and that person takes possession of his house and improvements, and agrees that Carter shall board and reside with him, and he does accordingly reside with him. This, according to all the authorities would be the possession of Carter; not because he resides with the lessee, but because of the tenancy. And it would be true that Carter resided on the land, but nevertheless he would not be a house-keeper on the land. And it may be as well presumed, that this was the state of the fact as otherwise; and for this reason, that Carter did not take the oath required by the act and instructions.

3. The act itself, and the regulations of the secretary require, that the land proposed to be entered should *include his improvement,* and to the fact that the improvement is included, affidavit has to be made. Was any such affidavit made? It was not. But an affidavit that embraced the truth and the fact, as it really was, no doubt was made. The facts disclosed by the affidavit were, that one-third of the land, dwelling house, and part of the improvement was on the land proposed to be entered, and the balance upon land owned by the affiant. The claim to the bounty of the government rested upon the answer in the affirmative of the question, whether the party was a settler and house-keeper on the land, and whether that particular portion of the land proposed to be entered by him, included the improvement upon which he was

settled and the *dwelling-house* in which he kept house. Instead of proving these facts by his affidavit, he proves facts inconsistent with them, to wit: that the improvements were included partly by the land proposed to be entered by him, and partly by other lands adjoining owned by him. This was coming as near the requirements of the law as could be done with truth. This will not do. The thing or fact required to be done or proved, must be done or proven, or no right vests.

4. The regulation of the secretary of the treasury in the book before referred to, page 568, amongst others contains this clause:

"Fourth. In case a pre-emptor has built his house immediately over the corner of a section, he can maintain his claim under the law, only to that half quarter section in which the greater portion of his improvement lies."

Now apply this clause to the case under consideration, and we will see that the complainant has not by his proof made out even a *prima facia* case. He is entitled to enter that half quarter section which includes the most of his improvement. When does this right vest? The answer is, at the day of the passage of the act, that is on the 5th April, 1832. On that day two of the eighths at the section corner were vacant and unappropriated, one of them afterwards was entered by him, without any thing being said about a right of pre-emption, and it is proved by the answer, which is responsive to the bill and uncontradicted, that but about one-fifth of the house was upon the land the subject of this contest. The balance, or the other four-fifths, was distributed upon three other eighths if you please equally, then the eighth proposed to be entered, at the date of the passage of the law had not and has not more of the house upon it than the others. But it is said that but two of the eighths were vacant; and it does not appear but that the largest portion of the house was upon the eighths appropriated, and that the two eighths vacant were equal, and therefore the right existed in the election of the complainant as to either: *non sequiter* for two good and sufficient reasons.

1. The terms of the fourth regulation just quoted are "he can maintain his claim *only* to that half quarter section in which the greatest portion of his improvement lies." To that *only* can he make his claim; if both are equal he has an election, which was

[Carter, Appellant, *v.* Spencer.]

not to be determined, until the expiration of the last minute but one of the six months in which under the act he has to make his claim; and by this means one hundred and sixty acres of land is kept out of market for six months, when but eighty acres by the act is all that is intended to be reserved from entry by the general enterer.  This was foreseen, and the secretary by virtue of the power given by the act made the regulation quoted to obviate the difficulty; and thereby no right is vested to either; and the court must presume, that such was the opinion of the complainant, for after the passage of the act, and before the application for the pre-emption he entered as a general enterer one of the vacant eighths, and it was an afterthought to set up his pretended claim to the other.

2. The other answer is that the defendant is the pursuer, the complainant seeking to divest a vested right, a legal title out of the defendant, and to vest it in himself.  In order to do this it is indispensable that he should prove all the facts and circumstances which would vest the right claimed by him, before the court will give him the relief asked.  Has he done this?  He has not.  One of these facts was proof that the largest portion of his dwelling house was upon the land claimed; but instead of proving this, he entirely omits it, and asks the court that the fact shall be presumed, and that too, when there is nothing upon which to ground such a presumption, but every thing to rebut it.

But the bill insists that Carter was entitled to a pre-emption which vested by virtue of the act of congress, at the date of its passage, and that he had six months in which to make and perfect his claim.  We trust we have shown conclusively, that he had no right to pre-emption to the land in controversy.  But, for one moment, and for the sake of argument, let us suppose that he had a right vested by the act of congress.  Let us next enquire, under what circumstances that right was to be perfected.  These circumstances are laid down and enumerated in the regulations of the secretary of the treasury, in the book before referred to, page 563.  They are:

"The operation of this pre-emption privilege in favor of housekeepers will exist until the 5th day of October next, and I have it in charge from the secretary of the treasury, to inform you that

this privilege must not have the effect to stay or interfere with, either public sales or private entries of lands during the same period." The sale of the public domain was not to be arrested by an act of bounty to a few favored individuals, but was to go on by public sale or private entry as usual. But, in order to prevent collision between the ordinary private entries, and the pre-emption rights intended to be secured to house-keepers, by the same regulations, the register or receiver was directed to require of an applicant on a private entry an affidavit "that the land proposed to be entered is not, to the best of his knowledge and belief, subject to any claim by pre-emption right under the provisions of the act of Congress, &c." This regulation in its terms, is directory to the officer to whom it is addressed, and the object of it is to satisfy the officers of the truth of the fact to be sworn to, with a view to prevent collisions. And no way affects the right any further than that the officer is under the control of his superior, and would, it is presumed, obey his orders and directions, and permit no entry unless the truth of the fact appeared, and he was satisfied no collision would or could arise. Suppose then, an entry is applied for by a general enterer, and no oath is required, but, without oath an entry is made, the money paid and the right of the enterer perfected by a patent from the government, before or after a claim legally set up by a person claiming a pre-emption. Is there any pretence that the patent can be set aside, or disregarded by the court, and the legal estate vested in the pre-emptor, or person claiming the right of pre-emption? It is submitted that there is not, and for obvious reasons, some of which we will proceed to state.

This case is not like the case of Hacklius' Heirs *v.* Lewis Cabel, Walker's Reports, page 91. There, a donation was made in consideration of services rendered, and the right was absolutely vested, and could not be divested. The right was not contingent, or to vest or not, upon the happening or not of any event, or of any contingency. It did not depend upon the fact whether the beneficiary did not pay or offer to pay any sum or sums of money, or make his application for the benefit in a given time, but was absolute and unconditional; and no one could step in between the beneficiary and the giver of the bounty, and arrest it in its delivery.

[Carter, Appellant, *v.* Spencer.]

In this case, the matter stands upon different grounds.   The enjoyment of the right is contingent, to depend upon the election of the party who is to be benefitted, that election to be determined within six months, by the performance of two acts: one the making of an affidavit, showing that he is within the rule laid down by the act of congress, and the other, the payment of the money, the price of the land.   When these acts are all done, and performed, the right is absolute, but not before.

The right which exists under the act by itself, without the other acts, is a right merely to do those acts by which the right to the thing will vest, and not a right to the property;—a mere right in contemplation, but not in being.   If the Congress had it in contemplation to vest the right to the thing absolutely in the *housekeeper*, by virtue of the act, unconditionally, without any thing else being done, it would have been declared in the act, that all entries within the six months upon land to which a right of preemption existed should be void.   But this was not done, and we conclude it was not their intention that it should be thus.

Before the application was made by the complainant, the defendant, Spencer, had paid his money to the officers of the government and received the certificate, which, according to all law, vested the legal estate in him.   He committed no fraud, nor was any committed by the officers of government.   Upon what principle is it then that we are to be deprived of our right, and the right vested in the complainant.   The conscience of the defendant is not affected, there is nothing of this kind upon which the complainant's supposed equity can rest.   There is no trust between the parties, direct or implied, expressed or by implication; no mistake or accident, unless it be a mistake or accident that the party now setting up a pretended right, possessed of volition and loco-motion, having the power to prosecute his rights, has slept upon them until another, in good faith, by pursuing the law, has acquired a right.

But again, it perhaps may be insisted, upon this part of the case, that the complainant having, within the six months, done every thing that was required of him, that it was the duty of the officer to report his case to the Department, which, upon looking into the case, would have directed the money to be refunded to

[Carter, Appellant, v. Spencer.]

the defendant, if, upon an examination into the complainant's case, it had been allowed; and that, the officer having failed to send on the claim for examination until it is now too late, the patent having issued to the defendant, this Court will so decree as to vest the right of the property as the same would have been had the officer done his duty; and we may be referred to the instructions of the Secretary of the Treasury. See book before referred to, 568.

To this our answer is, that our entry was made in June, and these instructions were dated July 28th, 1832, more than a month after our entry was made. Our right was complete before this rule was in operation; and we cannot be governed by it.

Again, if the complainant has suffered, it is by the neglect of himself and the officers of the government, or by the neglect of one or the other of them, without any fault upon our part. If the neglect is upon the part of the complainant, the effects of it will be visited upon his own head, and not upon ours, with whom there is no fault; and if the neglect is upon the part of the officers of the government, and the complainant has sustained damage thereby, his remedy is against those officers, and not against us, who have done no wrong. Upon the whole case, we are led to the conclusion, that the Chancellor did right in dismissing the bill, and his decree must be affirmed.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The legal title is unquestionably with the defendant. A patent is the highest evidence of title; it is evidence that all prerequisites have been complied with, and cannot be questioned either in a court of law or equity, unless it be on the ground of fraud or mistake.

The legal title being with the defendant, it devolves on the complainant to shew that it was obtained in fraud of his rights. There is no proof whatever which can be deemed sufficient to establish fraud, nor was the entry such as to raise a presumption of fraud. The act under which complainant claims is very indefinite: it merely provided that actual settlers, being house keepers, should have a right of pre-emption to enter within six months, a half quarter section, to include his improvements, under

such regulations as had been or might be prescribed by the secretary of the treasury.   Under this act the secretary prescribed rules and regulations by which individuals claiming under it, should be governed.   The claimant was required to make proof by his own affidavit, supported by the affidavit of a disinterested person, that he was an actual house keeper and settler on the land.   Another rule was that the right conferred by the act was not to interfere with public sales or private entries.   And in order to prevent confusion, an applicant for private entry, was required to swear that the land designed to be entered was not subject to a right of pre-emption.   In the violation of this last mentioned rule it is said the fraud was perpetrated, but this position is not supported by proof.   It is alleged in the bill, that Spencer entered without making this affidavit.   This is admitted by the answer, which avers also, that no such affidavit was required of him by the register, in addition to which the entry without it, is evidence that it was dispensed with by the register.   If therefore he chose to permit an entry without the affidavit, this in itself is not evidence of fraud.   It was a mere instruction which required the affidavit, the law did not require it.   By the general law, the land was subject to entry by any person who should apply for it, and by the second instruction given, that right was not to be interfered with.   But if the instruction was violated, it was done by the register, and not by Spencer.   No concealment, evasion or trick is fixed on Spencer, and in the absence of such proof there can be no ground for the interference of a court of chancery.

But there are other considerations which must be regarded as prejudicial to the complainant.   We are told in the argument that the complainant's house was placed where the lines of four different sections intersect, or in other words, over the corner.   That in December, 1831, he made a private entry in section 14, and in June, 1832, after his right of pre-emption had been given, he entered in section 11, adjoining the land claimed, which last entry also covered part of his improvement,   His right of pre-emption was as good to that part of section 11, as it was to section 12; perhaps it was better.   There is another rule prescribed by the secretary of the treasury directly in point; it is that when a settlement was made on the corners of sections, the pre-emption should

[Carter, Appellant, *v.* Spencer.]

be confined to that section in which most of the improvement had been made. Carter has stated that one third of his improvement was in section 12; where was the other two thirds? It was, says the bill, on adjoining lands around him. His right of pre-emption accrued on the 5th day of April, to that eighth of land in which he had made the greatest improvement; and it was essential that this should have been made known, and yet we find that his affidavit to the register conceals it; his bill conceals it, and whether by design or accident, it gives an unfavorable aspect to the case. If the most of his improvement was in section 11, his right of pre-emption was there, and he could not transfer it by entering that eighth, and then claiming another. But when he entered, he had availed himself of all the benefit the law intended for him, for a right of pre-emption, is but a right to buy.

The decree of the chancellor must be affirmed.